1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

7

## EASTERN DISTRICT OF CALIFORNIA

8

9  RICHARD OLIVER,                           )   1:02-cv-05472-OWW-TAG HC
                                            )
10          Petitioner,                     )   REPORT AND RECOMMENDATION
                                            )   TO DENY PETITION FOR WRIT OF
11  v.                                      )   HABEAS CORPUS
                                            )
12  ANTHONY LAMARQUE,                       )   (Doc. 1)
                                            )
13          Respondent.                     )
                                            )
14  _____)

15      Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

16  pursuant to 28 U.S.C. § 2254.

17                              **PROCEDURAL HISTORY**

18      Petitioner is in custody of the California Department of Corrections serving a sentence of

19  28 years to life pursuant to a judgment of the Superior Court of California, County of Stanislaus,

20  following his conviction by jury of felony fleeing from and attempting to elude a peace officer (Cal.

21  Veh. Code § 2800.2), and possession of heroin (Cal. Health & Saf. Code § 11350). (Clerk's

22  Transcript on Appeal ("CT") 292-293).

23      The California Court of Appeal for the Fifth Appellate District ("5th DCA") affirmed the

24  conviction in an unpublished opinion filed on March 21, 2000. (Doc. 5, Exh. C). A petition for

25  review was filed in the California Supreme Court on May 8, 2000. (Doc. 5, Exh. E). The petition

26  raised the following grounds for relief: (1) the trial court's failure to exclude a heroin sample found

27  in Petitioner's car because of a compromised chain of custody; (2) insufficient evidence to convict

28  Petitioner of possession; and  (3) abuse of the trial court's discretion in denying Petitioner's motion

1  to strike a prior conviction. (Doc. 5, Exh. E). The petition was summarily denied by the California

2  Supreme Court on July 12, 2000. (Doc. 5, Exh. F).

3  On October 24, 2000, Petitioner filed a petition for writ of habeas corpus with the Superior

4  Court of California, County of Stanislaus ("Superior Court"), raising the same five claims contained

5  in the instant habeas petition. (Doc. 5, Exh. G). On November 6, 2000, the Superior Court denied

6  the petition. (Doc. 5, Exh. H). The Superior Court denied Petitioner's claim of ineffective

7  assistance of trial counsel, calling it "internally contradictory and vague." (Doc. 5, Exh. H).

8  Petitioner's claim of ineffective assistance of appellate counsel was deemed "not within the

9  jurisdiction" of the Superior Court. (Doc. 5, Exh. H). Petitioner's remaining claims were

10  procedurally barred under state law because they were claims he could have, but did not, raise in his

11  direct appeal. (Doc. 5, Exh, H).

12  On December 5, 2000, Petitioner filed a habeas petition raising identical claims in the

13  5th DCA. (Doc. 5, Exh. I). The 5th DCA denied the petition on December 14, 2000. (Doc. 5,

14  Exh. J). On January 2, 2001, Petitioner presented the same claims in a habeas petition filed in the

15  California Supreme Court. (Doc. 5, Exh. K). The California Supreme Court denied the petition on

16  April 25, 2001. (Doc. 5, Exh. L).

17  The instant petition was filed on April 26, 2002. (Doc. 1). Respondent's answer was filed

18  on August 5, 2002. (Doc. 5). Petitioner's traverse was filed on December 13, 2002. (Doc. 13).

19  **FACTUAL BACKGROUND**

20  The Court adopts the facts as summarized by the 5th DCA, in relevant part, as follows:

21  Shortly before 1 a.m. on January 9, 1996, California Highway Patrol (CHP) Officers Stuart
   Wagner and Eldon Sousa were on duty in a patrol car traveling south on Highway 99 near Modesto
22  when they saw a pickup truck ahead of them traveling in the same direction, in the slow lane. After
   determining that the pickup was traveling approximately 75 miles per hour in a 65-miles-per-hour
23  zone, Officer Sousa, who was driving the patrol car, pulled into the same lane as the pickup truck
   and, intending to effect a stop, accelerated in an effort to get "right behind" the pickup to "get [the
24  driver's] attention." At that point the pickup accelerated, reaching a speed of 85 miles per hour
   where the highway crosses Mitchell Road.
25
   Officer Sousa activated his red overhead light. The pickup continued traveling at 85 miles
26  per hour and changed lanes, entering the fast lane next to the median which divides the north and
   southbound lanes of the highway. Next, the pickup slowed down to approximately 70 miles per
27  hour. Officer Sousa testified that at that point, he "observed the driver stick his left hand out the
   window and[,]" with a right-to-left flicking motion, "toss a white piece of paper, plastic-looking
28

1  thing . . . ." Both officers noted where the item was thrown from the pickup; Officer Sousa testified
   that this occurred "a few hundred feet north of the Faith Home Road overcrossing."

2

   After observing the driver throw the object from the pickup, Officer Sousa turned on his
3  siren, "wig-wag" lights and alternating high beams. Then, just after passing the Faith Home Road
   overcrossing, the driver of the pickup drove onto and across the dirt median and onto the northbound
4  side of the freeway, continuing in a southbound direction until, after traveling approximately one and
   one half miles, he crossed into the right hand lane, appeared to lose control on the shoulder, and
5  crashed into the embankment just south of Keyes Road.

6      During the time the driver of the pickup drove on the wrong side of the highway, he changed
   lanes several times, passed approximately three to five other vehicles traveling in the opposite
7  direction and reached a speed of 95 miles per hour. For approximately three-fourths of that time, the
   pickup's lights were off. At one point, as a large truck approached, the pickup's lights went back on
8  and, after the two vehicles narrowly averted a head-on collision, the lights went off again.

9      After the pickup came to a stop, the officers crossed the median and approached it.
   [Petitioner] was sitting in the driver's seat. There were two other persons in the pickup. The officers
10 placed all three persons under arrest. Approximately one-half hour after the chase ended, Officer
   Sousa drove back to the area 200 to 500 feet north of the Faith Home Road overcrossing and began
11 looking on the median for the object he had seen the driver throw from the pickup. After searching
   for approximately 15 minutes, he found a plastic baggie with a dark, hard substance inside. There
12 was a "lot of debris" on the median. With the exception of the baggie, which was "relatively dry"
   with a "light moisture on it[,]" indicating it "hadn't been there for very long[,]""[e]verything else in
13 the median was saturated with water, water logged . . . ."

14

   Wesley Gibson [called as a defense witness] testified to the following. He was a passenger
15 with [Petitioner] on January 9 when the pickup crashed. Also in the pickup was Athena Hipp.
   [Petitioner] had been giving a ride to Hipp and Gibson. At some point before the crash, Gibson
16 noticed a police car behind them, after which he saw Hipp throw an object out the driver's side
   window.

17

   (Doc. 5, Exh. C, pp. 2-5).

18

## DISCUSSION

19

### I. Jurisdiction

20

   Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant

21

   to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of

22

   the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362,

23

   375 fn. 7, 120 S.Ct. 1495 (2000). Petitioner asserts that he suffered violations of his rights as

24

   guaranteed by the United States Constitution. The challenged conviction arises out of the Stanislaus

25

   County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a);

26

   2241(d). Accordingly, the Court has jurisdiction over this action.

27

   ///

28

3

1       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

2   1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

3   Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997), cert. denied. 522 U.S. 1008, 118 S.Ct. 586

4   (1997); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997) (quoting Drinkard v. Johnson, 97 F.3d

5   751, 769 (5th Cir. 1996)), cert. denied. 520 U.S. 1107, 117 S.Ct. 1114 (1997), overruled on other

6   grounds by Lindh, 521 U.S. 320, 117 S.Ct. 2059 (holding the AEDPA only applicable to cases filed

7   after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is

8   therefore governed by the AEDPA.

9   **II. Legal Standard of Review**

10      Under the AEDPA, a petition for writ of habeas corpus will not be granted unless the

11  adjudication of a state prisoner's claim "resulted in a decision that was contrary to, or involved an

12  unreasonable application of, clearly established Federal law, as determined by the Supreme Court of

13  the United States" or "resulted in a decision that was based on an unreasonable determination of the

14  facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d);

15  Lockyer v. Andrade, 538 U.S. 63, 123 S. Ct. 1166 (2003); Williams v. Taylor, 529 U.S. at 413, 120

16  S.Ct. 1495; Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2004). The Supreme Court explains that

17      [A] state court decision is "contrary to" our clearly established [Supreme Court]
        precedent if the state court it applies a rule that contradicts the governing law set forth
18      in [Supreme Court] cases, or "if the state court confronts a set of facts that are
        materially indistinguishable from a [Supreme Court decision] and nevertheless arrives
19      at a result different from [Supreme Court] precedent.
        . . .
20
        A state court decision involves an "unreasonable application" of Supreme Court
21      precedent if the state court identifies the correct governing legal principle from
        [Supreme Court] decisions but unreasonably applies that principle to the facts of the
22      prisoner's case.
        . . .
23
        The "unreasonable application" clause requires the state court decision to be more than
24      incorrect or erroneous. The state court's application of clearly established law must be
        objectively unreasonable.
25
26  Lockyer v. Andrade, 538 U.S. at 73, 75 (citations omitted). Any factual determinations made by the

27  state court are presumed correct unless rebutted by clear and convincing evidence. Miller-El v.

28  Cockrell, 537 U.S. 322, 123 S.Ct. 1029 (2003); Gonzalez v. Pliler, 341 F.3d 897, 903 (9th Cir. 2003).

To determine whether a state court decision is contrary to or an unreasonable application of federal law, the federal habeas court looks to the "last reasoned decision of [a] state court as the basis of the state court's judgment." Powell v. Galaza, 328 F. 3d 558, 563 (9th Cir. 2003) (quoting Franklin v. Johnson, 290 F.3d 1223, 1233 n. 3 (9th Cir. 2002)). However, when the state court provides no reasoning for its decision, the federal court independently reviews the record to determine whether under the AEDPA, the state court properly denied habeas relief, focusing on whether the state court's resolution of petitioner's claim was an unreasonable application of clearly established federal law. See Greene v. Lambert, 288 F. 3d 1081, 1088-89 (9th Cir. 2002); Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2002). "Only by that examination may [the federal court] determine whether the state court's decision was objectively unreasonable." Id. at 982.

## III. Review of Petitioner's Claims

The instant petition alleges the following grounds for relief:

Ground 1. The trial court erred as it failed to seek or obtain the perjury acknowledgment and agreement as required by California Code of Civil Procedure 232 (a) for prospective jurors.

Ground 2. The prosecution failed to investigate and/or failed to disclose exculpatory evidence favorable to Petitioner violating his constitutional rights secured by the Sixth and Fourteenth Amendments of the United States Constitution.

Ground 3. Defense counsel failure to provide effective assistance of counsel which violated petitioner's Sixth Amendment rights secured by the United States Constitution.

Ground 4. Petitioner did not waive arraignment for judgement and the court erred by improperly considering juvenile information in the probation report, a January 17, 1986 conviction not supported by the evidence, and failed to properly pronounce judgment by not citing any prior convictions which resulted in an improper sentence. Such actions violated Petitioner's Fourteenth Amendment rights secured by the United States Constitution.

Ground 5. The imposition of California's "3-strike" law sentence in this matter is so grossly disproportionate to the crimes that it violates the Eight Amendment.

### A. Grounds One, Two, Four, and Five Are Procedurally Barred.

Respondent contends that Petitioner's claims in Grounds One, Two, Four, and Five are procedurally barred from federal habeas review because they were not raised on direct appeal. Ex parte Dixon, 41 Cal.2d 756, 759, 264 P. 2d 513 (1953). (Doc. 5, p. 8). The Court agrees.

///

1   A federal court will not review claims in a petition for writ of habeas corpus when the state

2   court denied relief on those claims based on a state procedural law that is both independent of federal

3   law and adequate to support the judgment. Ylst v. Nunnemaker, 501 U.S. 797, 801, 111 S. Ct. 2590

4   (1991); Coleman v. Thompson, 501 U.S. 722, 729-30, 111 S.Ct. 2546 (1991). "A district court

5   properly refuses to reach the merits of a habeas petition if the petitioner defaults on the particular

6   state's procedural requirements and is unable to demonstrate cause and prejudice or a fundamental

7   miscarriage of justice." Park v. California, 202 F.3d 1146, 1150 (9th Cir. 2000). This doctrine of

8   procedural default is based on concerns of comity and federalism. Coleman, 501 U.S. at 730-32.

9   The mere occurrence of a procedural default will not necessarily bar a federal court from

10  reviewing claims in a petition for writ of habeas corpus. For the procedural default doctrine to apply

11  and thereby bar federal review, the state court must also "'clearly and expressly' state that its

12  judgment rested on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263, 109 U.S. 1038

13  (1989), citing Caldwell v. Mississippi, 472 U.S. 320, 327, 105 S.Ct. 2633 (1985) (quoting Michigan

14  v. Long, 463 U.S. 1032, 1041, 103 S.Ct. 3469 (1983)).

15  1. State Law Procedural Ground - the Dixon Rule.

16  The first step in deciding whether there has been a procedural default is to determine whether

17  the state court clearly and expressly denied relief on a state procedural ground. Here, Petitioner

18  pursued a direct appeal, and later presented additional claims to the Superior Court for collateral

19  review in a petition for writ of habeas corpus. Petitioner subsequently presented the same habeas

20  claims to the 5th DCA and the California Supreme Court. The Superior Court denied Petitioner's

21  habeas corpus petition, ruling that his ineffective assistance of counsel claim was "internally

22  contradictory and vague" as to trial counsel and "not within the jurisdiction of this Court" as to

23  appellate counsel. (Doc. 5, Exh. H).[1] The Superior Court then determined that Petitioner's "other

24  claims are not congnizable [sic] on Habeas Corpus as such issues were or could have been raised on

25  appeal." (Id.).

26  ///

27

28  [1] The instant petition does not include a claim of ineffective assistance of appellate counsel.

1    In its ruling denying habeas relief, the Superior Court cited two cases: In re Gomez,

2    31 Cal.App.3d 728, 732, 107 Cal. Rptr. 609 (1973), and In re Shipp, 62 Cal.2d 547, 43 Cal.

3    Rptr. 3 (1965).  Both of these cases reiterate the state procedural rule of Ex parte Dixon,

4    which provides that:

5        The general rule is that habeas corpus cannot serve as a substitute for an appeal, and,
         in the absence of special circumstances constituting an excuse for failure to employ
6        that remedy, the writ will not lie where the claimed errors could have been, but were
         not, raised upon a timely appeal from the judgment of conviction.

7

8    Ex parte Dixon, 41 Cal. 2d at 759.  Pursual to the Dixon rule,  in a habeas corpus proceeding, a

9    California court will not review the merits of a claim if that claim could have been raised in a timely

10   appeal, but was not.

11   The 5th DCA denied Petitioner's habeas petition, which contained the same claims as his

12   Superior Court habeas petition, without citation or comment on December 14, 2000. (Doc. 5, Exh. I).

13   The California Supreme Court denied Petitioner's subsequent habeas petition, also containing the

14   same claims, without citation or comment on April 25, 2001. (Doc. 5, Exh. L). By its silent order

15   denying review of the Superior Court's decision denying habeas relief,  the California Supreme

16   Court is deemed to have denied Petitioner's claims for the same reasons stated in the decision of the

17   Superior Court. Ylst, 501 U.S. at  801, 803 (explaining that "Where there has been one reasoned

18   state judgment rejecting a federal claim, later unexplained orders upholding that judgment or

19   rejecting the same claim rest upon the same ground.").  As the last state court to give reasons for its

20   judgment, the Superior Court denied the petition unambiguously on state law procedural grounds,

21   i.e., the Dixon rule.  The next step is to determine whether the Dixon rule is both independent of

22   federal law and adequate to support the judgment. If it is, habeas relief is procedurally barred.

23   2. Independence.

24   Even when a petitioner has violated a state procedural law, the procedural default doctrine

25   does not bar federal habeas relief unless the state procedural law is both independent of federal law

26   and adequate to support the judgment. Coleman, 501 U.S. at 729-32, 735. For a state procedural

27   rule to be independent of federal law, "the state law basis for the decision must not be interwoven

28   with the federal law." La Crosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001) (citing Michigan v.

Long, 463 U.S. at 1040-41, and Harris, 489 U.S. at 265); Morales v. Calderon, 85 F.3d 1387, 1393 (9th Cir. 1996) (quoting Coleman, 501 U.S. at 735). A state law ground is interwoven with federal law if "the state has made application of the procedural bar depend on an antecedent ruling on federal law [such as] the determination of whether federal constitutional error has been committed." Park, 202 F.3d at 1152 (quoting Ake v. Oklahoma, 470 U.S. 68, 75, 105 S.Ct. 1087 (1985)).

The Ninth Circuit Court of Appeals determined that prior to 1998, the Dixon rule was not independent of federal law. Park v. California, 202 F.3d 1146 (9th Cir. 2000). In Park, the Ninth Circuit reasoned that because a fundamental constitutional error exception to the Dixon rule existed under state law, application of the Dixon rule necessarily involved consideration of federal law issues and therefore was "interwoven with the federal law." Id. at 202 F.3d at 1152-53. Two years earlier, the California Supreme Court explicitly stated that it would no longer consider whether an error alleged in a state petition constituted a federal constitutional violation. In re Robbins, 18 Cal.4th 770, 811-812 & n. 32, 77 Cal. Rptr. 2d 153 (1998). In making it clear that it would no longer consider federal law in applying the Dixon rule and its exceptions, the California Supreme Court stated:

> [W]e shall, in this case and in the future, adopt the following approach as our standard practice: We need not and will not decide whether the alleged error actually constitutes a federal constitutional violation. Instead, we shall assume, for the purpose of addressing the procedural issue, that a federal constitutional error is stated, and we shall find the exception inapplicable if, based upon our application of state law, it cannot be said that the asserted error led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner.

In re Robbins, 18 Cal. 4th at 811-812 & n.32.

In 2003, the Ninth Circuit decided that the California Supreme Court's denial of a habeas petition for untimeliness constituted an independent and adequate state ground barring federal habeas relief:

> [W]e respect the California Supreme Court's sovereign right to interpret its state constitution independent of the federal law. Applying Robbins prospectively, we affirm the district court's determination that the California Supreme Court's post-Robbins denial of [a] state petition for lack of diligence (untimeliness) was not interwoven with federal law and therefore is an independent procedural ground.

Bennett v. Mueller, 322 F. 3d 573, 583 (2003). Thus, application of the untimeliness bar is now independent of federal law.

1    Although Bennett did not involve the Dixon rule per se, its rationale applies with equal force

2  to a post-Robbins application of the Dixon bar because the Dixon bar and the --untimeliness bar are

3  both subject to analogous constitutional error exceptions and state court consideration of post-

4  Robbins applications of these bars no longer involves federal law. See La Crosse, 244 F.3d at 707

5  n. 29; Bennett, 322 F.3d at 1583; In re Robbins, 18 Cal. 4th at 811-812 & n.32. Thus, the Court

6  concludes that a post-Robbins invocation of the Dixon rule is independent of federal law.

7    To determine whether the state court's application of the Dixon rule is independent of federal

8  law in this case, the Court must look at the state decision invoking the Dixon rule. See Bennett, 322

9  F. 3d at 582-83; Park 202 F.3d at 1153; La Crosse, 244 F. 3d at 707. Here, the Superior Court

10  invoked the Dixon rule when it denied Petitioner's habeas petition on November 6, 2000. (Doc. 5,

11  Exh. G). The 5th DCA and the California Supreme Court thereafter silently denied Petitioner's same

12  habeas claims on December 14, 2000 and April 25, 2001, respectively. (Doc. 5, Exhs. J, L).

13  Robbins was decided on August 3, 1998. Because the state court's application of the Dixon rule was

14  "post-Robbins" and therefore predicated only upon consideration of state law, it was independent of

15  federal law regardless of whether the Court looks at Petitioner's first or last state habeas petition.

16    3. Adequacy.

17    A state procedural rule on which the state relies to establish a procedural default must also be

18  "adequate to support the judgment." Coleman, 501 U.S. at 735.  A state procedural law is adequate

19  to support the judgment when it is "well-established and consistently applied." Bennett, 322 F.3d at

20  582 (citing Poland v. Stewart, 169 F. 3d 573, 577 (9th Cir. 1999)).  The question of whether a state

21  procedural default rule is well-established and  consistently applied is determined when the actual

22  default occurs, not when the state court applies its procedural rule to bar the petitioner's claim.

23  Fields v. Calderon, 125 F.3d 757, 760-61 (9th Cir. 1997); Calderon v. U.S. Dist. Ct. For E.D. of Cal.,

24  103 F.3d 72, 75 (9th Cir. 1996), cert. denied, 521 U.S. 1129, 117 S.Ct. 2532 (1997) (relevant time to

25  assess application of the Dixon rule is when petitioner "had an opportunity to raise the claims on

26  direct appeal"). See Calderon v. Bean, 96 F.3d 1126, 1131 (9th Cir. 1996), cert. denied, 520 U.S.

27  1204, 117 S.Ct. 1569 (1997) (evaluating the Dixon rule at the time petitioner filed a direct appeal).

28  Here, the relevant date is December 10, 1998, when Petitioner filed his opening brief on direct

1    appeal. (Doc. 5, Exh. B). Thus, the appropriate inquiry is whether the Dixon rule was well-
2    established and consistently applied as of December 10, 1998.

3            a. Well-Established.

4            In Park, the Ninth Circuit analyzed California's procedural limitations on habeas corpus
5    claims, including the Dixon rule, and found that prior to 1993, they were "undefined and imprecise."
6    Park, 202 F.3d 1151-53. As a result, the Ninth Circuit determined that such state procedural bars
7    were neither well-established nor consistently applied prior to 1993. Id. In its analysis, the Ninth
8    Circuit noted the California Supreme Court's decisions in In re Clark, 5 Cal. 4th 750, 21 Cal.Rptr. 2d
9    509 (1993) and In re Harris, 5 Cal. 4th 813, 21 Cal. Rptr. 2d 373 (1993) and evaluated their respective
10   impact upon applications of the untimeliness rule and the Dixon rule: "These decisions were
11   intended to 'reestablish California's procedural rules governing state habeas petitions and clearly
12   define and limit the applicable exceptions.'" Park, 202 F.3d at 1151-52 (quoting Fields, 125 F.3d at
13   763-74).

14           The California Supreme Court decided both In re Clark and In re Harris on July 29, 1993.
15   In re Clark, 5 Cal.4th 750; In re Harris, 5 Cal. 4th 813. Thus, these decisions had been the law for
16   more than five years when Petitioner's procedural default occurred on December 10, 1998. The
17   Dixon rule was established in 1953, when Ex parte Dixon was decided. Ex parte Dixon, 41 Cal. 2d
18   756. Given the longstanding tenure of the Dixon rule, and the California Supreme Court's decisions
19   "clearly defin[ing] and limit[ing] its applicable exceptions," the Court concludes that the Dixon rule
20   was well-established at the time of Petitioner's December 10, 1998 procedural default. Fields, 125
21   F.3d at 763-64.

22           b. Consistently Applied.

23           The Court next considers whether the Dixon rule was consistently applied at the
24   time of Petitioner's procedural default. The Ninth Circuit established a burden-shifting
25   process to determine whether a state procedural rule is adequate:

26           Once the state has adequately pled the existence of an independent and adequate state
             procedural ground as an affirmative defense, the burden to place that defense in issue
27           shifts to the petitioner. The petitioner may satisfy this burden by asserting specific
             factual allegations that demonstrate the inadequacy of the state procedure, including
28   ///

1   citation to authority demonstrating inconsistent application of the rule.  Once having
    done so, however, the ultimate burden is the state's."

2   Bennett, 322 F.3d at 586.  In his answer to the petition, Respondent alleges that "four of the five

3   claims in the instant Petition have been procedurally defaulted" and his supporting attached

4   memorandum of points and authorities specifically identifies the defaulted claims. (Doc. 5, pp. 3, 7-

5   10).  Respondent has satisfied his initial burden of pleading the existence of an independent and

6   adequate state procedural ground as an affirmative defense, and thereby shifted the burden to place

7   that defense in issue to Petitioner.

8       In order to meet his burden under Bennett, Petitioner need only assert specific factual

9   allegations that demonstrate the inadequacy of the Dixon rule, including citations to authority

10  demonstrating an inconsistent application of the Dixon rule in December 1998.  Id. Petitioner has

11  failed to make any factual allegations demonstrating the inconsistent application of the Dixon rule.

12  Consequently, Petitioner has not met his burden of demonstrating inconsistent application of the

13  Dixon rule.[2]  Thus, the Court concludes that Respondent has satisfactorily established that the state

14  court's application of the Dixon rule was an adequate state ground for rejection of Petitioner's

15  claims.

16      4. Cause and Prejudice Exception.

17      If the respondent has asserted the procedural default doctrine in a timely and proper fashion,

18  and if the default provides an independent and adequate state procedural ground for decision, the

19  petitioner is barred from raising the defaulted claims unless he can 1) excuse the default by

20  demonstrating *cause* for the default and *actual prejudice* as a result, *or* 2) show that the case falls

21  within the category of cases the Supreme Court has characterized as fundamental miscarriages of

22  justice.  Harris, 489 U.S. at 262; Coleman, 501 U.S. at 751.  Cause is a legitimate excuse for the

23  default.  Thomas v. Lewis, 945 F.2d 1119, 1123 (9th Cir. 1991).  Cause exists if the petitioner can

24  show that some objective factor external to the defense impeded efforts to comply with the state's

25

26

27      [2] The same burden-shifting analysis and result applies to the question of whether the Dixon rule
    was consistently applied at the time of Petitioner's default.  Bennett's burden-shifting analysis assesses
28  adequacy, and adequacy relates to whether the state law ground for decision is "well-established and
    consistently applied."  Bennett, 322 F.3d at 583.

1  procedural rules. Coleman, 501 U.S. at 753; Murray v. Carrier, 477 U.S. 478, 488, 106 S.Ct. 2639

2  (1986); see McCleskey v. Zant, 499 U.S. 467, 493, 111 S.Ct. 1454 (1991). Prejudice is a legitimate

3  excuse for the default. Thomas, 945 F.2d at 1123. Actual prejudice exists if the errors complained

4  of created more than a possibility of prejudice; they must have "worked to [the petitioner's] *actual*

5  and substantial disadvantage, infecting [the petitioner's] entire trial with error of constitutional

6  dimensions." United States v. Frady, 456 U.S. 152, 170, 102 S.Ct.1584 (1982)

7       Here, Petitioner failed to show good cause for his failure to present his claims in his direct

8  appeal. . The Court has reviewed the record and finds nothing to support a finding of good cause.

9  Likewise, Petitioner presents no argument for, and makes no showing of, actual prejudice. In his

10  traverse, Petitioner does not address the issue of procedural default at all

11       5. Fundamental Miscarriage of Justice.

12       A petitioner who cannot show cause and prejudice for his procedural default can still bring

13  his claims in a federal habeas petition if he can demonstrate that failure to consider his claims will

14  result in a "fundamental miscarriage of justice." Coleman, 501 U.S. at 750. "[T]he principles of

15  comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of

16  correcting a fundamentally unjust incarceration.'" Murray, 477 U.S. at 495 (quoting Engle v. Isaac,

17  456 U.S. 107, 135, 102 S. Ct. 1558 (1982)). A fundamental miscarriage of justice occurs when "a

18  constitutional violation has probably resulted in the conviction of one who is actually innocent."

19  Schlup v. Delo, 513 U.S. 298, 327, 115 S.Ct. 851 (1995) (quoting Murray, 477 U.S. at 495-96);

20  Boyd. v. Thompson, 147 F. 3d 1124, 1127 (9th Cir. 1998).

21       Here, Petitioner does not argue that he is actually innocent of the crimes for which he was

22  convicted or that some other individual committed the crimes for which he was found guilty.

23  Petitioner's many arguments involve allegations of trial error, prosecutorial misconduct, and

24  ineffective assistance of counsel leading to his convictions. None of Petitioner's claims rise to the

25  level of a "fundamental miscarriage of justice" sufficient to excuse the absence of cause for the

26  default, and the record does not support such an inference.

27       Accordingly, for the reasons stated above, the Court finds that Respondent has timely and

28  adequately raised the procedural default doctrine, and Petitioner's claims in Grounds One, Two,

1   Four, and Five are procedurally barred from federal habeas review. However, even assuming,

2   arguendo, that these claims were not procedurally barred, they must nevertheless be denied on their

3   merits.

4   **B. Petitioner's Substantive Claims Should Be Denied.**

5   Petitioner's claims in Grounds One, Two, Four and Five were not raised in Petitioner's direct

6   appeal from his conviction. (Doc. 5, Exh. B). Instead, they were first presented in a petition for writ

7   of habeas corpus to the Superior Court filed on October 24, 2000. (Doc. 5, Exh. G, p. 3). On

8   November 6, 2000, the Superior Court denied each of these claims, stating: "Defendant's claims are

9   not cognizable on Habeas Corpus as such issues were or could have been raised on appeal. Habeas

10  Corpus is not a substitute for appeal." (Doc. 5, Exh. H). Petitioner subsequently presented the same

11  claims in habeas petitions filed in the 5th DCA and the California Supreme Court. Both courts denied

12  the petitions without comment or citation. (Doc. 5, Exhs. I, J, K, and L).

13  The last "reasoned" state court decision on the claims in Ground One, Two, Four and Five

14  was made by the Superior Court, who rejected the claims based on the procedural bar of the Dixon

15  rule. Ex parte Dixon, 41 Cal 2d at 759. The Dixon rule is a state procedural rule that precludes state

16  court review of the merits of a claim. Consequently, the Superior Court's decision was not an

17  adjudication on the merits within the meaning of federal habeas review; its procedural denial of

18  Petitioner's claims provided no reasoning for deciding the merits of the claims in Grounds One,

19  Two, Four and Five. Lambert, 393 F.3d at 974. The Court concludes that under these circumstances,

20  any analysis of the merits of the claims in Grounds One, Two, Four and Five must be conducted as

21  though there is no reasoned state court decision.

22  When the state court does not supply reasoning for a decision, the Ninth Circuit has

23  instructed that the federal habeas court should conduct an independent review of the record to

24  determine whether under the AEDPA, the state court properly denied habeas relief. See Greene v.

25  Lambert, 288 F, 3d 1091, 1088-89 (9th Cir. 2002). The federal habeas court's review focuses on

26  whether under Supreme Court precedent, the state court's resolution of petitioner's claims was

27  contrary to, or an unreasonable application of, clearly established federal law. Id.; Delgado v. Lewis,

28  223 F.3d 976, 982 (9th Cir. 2002).

1    Therefore, in the instant case, the Court will independently review the record to determine

2    whether the state court's rejection of Petitioner's claims in Grounds One, Two, Four and Five was

3    contrary to, or involved an unreasonable application of, clearly established Federal law. Since

4    Ground Three is not procedurally defaulted, the Court will analyze it under the AEDPA's traditional

5    deferential standard to determine whether the state court's decision was contrary to, or involved an

6    unreasonable application of, clearly established Federal law. 28 U.S.C. § 2254 (d)(1).

7

8    **Ground 1.    The trial court erred as it failed to seek or obtain the perjury**
     **acknowledgment and agreement as required by California**
9    **Code of Civil Procedure 232 (a) for prospective jurors.**

10    Petitioner contends that the trial court committed a structural error by failing to administer

11   the oath of truthfulness to, and obtain acknowledgments from, the prospective jurors. Cal. Code of

12   Civ. Proc. § 232(a).  (Doc. 1, p. 9).    Petitioner's claim is without merit.

13    California Code of Civil Procedure § 232 provides:

14    (a) Prior to the examination of prospective trial jurors in the panel assigned for voir
     dire, the following perjury acknowledgment and agreement shall be obtained from the
15   panel, which shall be acknowledged by the prospective jurors with the statement "I
     do":
16

17   'Do you, and each of you, understand and agree that you will accurately and truthfully
     answer, under penalty of perjury, all questions propounded to you concerning your
18   qualifications and competency to serve as a trial juror in the matter pending before this
     court; and that failure to do so may subject you to criminal prosecution.'
19

20   (b)    As soon as the selection of the trial jury is completed, the following
     acknowledgment and agreement shall be obtained from the trial jurors, which shall be
     acknowledged by the statement "I do":
21

22   'Do you and each of you understand and agree that you will well and truly try the cause
     now pending before this court, and a true verdict render according only to the evidence
     presented to you and to the instructions of the court.'

23   Cal. Code of Civ. Proc. § 232.

24    On December 10, 1997, the trial court commenced jury selection by screening a panel of

25   prospective jurors. (CT 171). The trial court failed to administer the § 232(a) oath to prospective

26   jurors.  At the conclusion of voir dire, a jury of 12 jurors plus one alternate juror was selected. At

27   that point, the trial court administered an oath to the trial jurors. The record reflects the fact that a

28

jury oath was administered to the trial juror, but does not indicate the words of the oath. (CT 171 ("A jury of twelve (12) jurors plus one (1) alternate is impaneled and sworn to try this case.")); (Reporter's Transcript on Appeal ("RT"), last page ("Whereupon, the 12 jurors and 1 alternate were duly sworn.")).

Petitioner contends that the trial court's failure to administer and seek acknowledgments of the initial oath at the commencement of the voir dire process was a structural error. Petitioner does not explain why it is structural; he merely raises the issue and alludes to the potential for jury misconduct from unsworn potential jurors "who are free to act in whatever manner they wished without fear of punishment." (Doc. 1, p. 9). He also states: "Since Petitioner can find no case law that addresses this issue, the Court can easily decide the issue after reviewing the statutory requirement of California Code of Civil Procedure 232(a)." (Doc. 1, p. 9).

A structural error is a constitutional error which affects "the framework within which the trial proceeds, rather than simply an error in the trial process itself." (Arizona v. Fulminante, 499 U.S. 279, 310, 111. S.Ct. 1246 (1991); see Chapman v. California, 386 U.S. 18, 23, 87 S.Ct. 824 (1967). A structural error "infects the entire trial process" and "necessarily renders trial fundamentally unfair." Neder v. United States , 527 U.S. 1, 8, 119 S. Ct. 1827 (1999), quoting Brecht v. Abrahamson, 507 U.S. 619, 630, 113 S.Ct. 1710 (1993) and Rose v. Clark, 478 U.S. 570, 577, 106 S.Ct. 3101 (1986).

A structural error is so "intrinsically harmful" that it requires automatic reversal without regard to its effect on the outcome. Neder, 527 U.S. at 8. The Supreme Court has found structural error only in a "very limited class of cases." Id. (citing Johnson v. United States, 520 U.S. 461, 468, 117 S.Ct. 1544 (1997) (citing Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792 (1963) (complete denial of counsel); Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437 (1927) (biased trial judge); Vasquez v. Hillery, 474 U.S. 254, 106 S.Ct. 617 (1986) (racial discrimination in selection of grand jury); McKaskle v. Wiggins, 465 U.S. 168, 104 S.Ct. 944 (1984) (denial of self-representation at trial); Walter v. Georgia, 467 U.S. 39, 104 S.Ct. 2210 (1984) (denial of public trial); Sullivan v. Louisiana, 508 U.S. 275, 113 S. Ct. 2078 (1983) (defective reasonable doubt instruction)).

///

1    The trial court's error in failing to administer and obtain acknowledgments of the initial oath

2  at the commencement of voir dire was not a structural error. It was a trial error of no constitutional

3  proportions. Unlike fundamental errors such as the complete denial of counsel or trial before a biased

4  judge, a trial court's failure to administer an initial oath to prospective jurors does not deprive a

5  defendant of "basic protections" without which "a criminal trial cannot reliably serve its function as

6  a vehicle for determining guilt or innocence an no criminal punishment may be regarded a

7  fundamentally unfair." Arizona, 499 U.S. at 310, quoting Rose, 478 U.S. at 577-78.

8    While claiming structural error and alluding to the potential for juror misconduct, the asserted

9  legal basis for Petitioner's claim in Ground One is based entirely on state law: Petitioner contends

10  that he is entitled to federal habeas relief because the trial court did not comply with Code of Civil

11  Procedure § 232(a). The California Supreme Court recently considered the effect of a trial court's

12  failure to administer an earlier version of the § 232(a) oath[3] to prospective jurors in one of three

13  panels at the commencement of voir dire, and whether it was a structural defect. People v. Carter,

14  No. S014021, WL 1939712 (Cal. Sup. Ct. Aug. 15, 2005). While noting that empaneling a juror

15  who is actually biased would present a structural error under California Supreme Court precedent,

16  the court found no structural error occurred because there was no showing that the trial court's error

17  in failing to swear some of the prospective jurors resulted in any biased jurors being included on the

18  jury. Id. at *36

19    Although Petitioner does not specify the federal constitutional grounds for his claim of

20  structural error, the Court has analyzed his claim as through he properly pleaded a federal

21  constitutional claim. To the extent that Petitioner's claim is merely a state law claim, it is not

22  cognizable in these proceedings. The role of the federal habeas court is limited to determining

23  whether the petitioner's *federal* constitutional or other *federal* rights have been violated and does not

24  extend to review of a state's application of its own laws. Jackson v. Ylst, 921 F.2d 882, 885 (9th

25  Cir. 1990); Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475 (1991) (noting that "it is not the

26

27  ————————————

28    [3] A 1989 amendment substituted "acknowledgment and agreement shall be obtained from" for "admonishment shall be administered to" in subdivision (a), and "Do you" for "You do" in the acknowledgment forms for §232 (a) and (b). (Amend. by Cal. Stats., 1989, c. 1416, § 10).

1  province of a federal habeas court to reexamine state-court determinations on state-law questions.").

2  To the extent that Petitioner's claim is a state law claim, it must be denied.[4]

3      The Court concludes that even if the trial court erred in failing to administer the oath and

4  obtain the perjury acknowledgment as required by state law, and even assuming, arguendo, that such

5  a lapse rose to the level of a constitutional violation, the error was harmless constitutional error

6  under Brecht v. Abrahamson, 507 U.S. 619 ("A federal court may grant habeas relief based on trial

7  error only when that error had substantial and injurious effect or influence in determining the jury's

8  verdict."); Calderon v. Coleman, 525 U.S. 141, 119 S.Ct. 500 (1998).

9      Petitioner has failed to show that he was prejudiced in fact by the trial court's error.

10  Although the trial court omitted giving the first oath to prospective jurors, the trial jurors ultimately

11  were instructed on their duties and are presumed to have performed them.  Petitioner has not pointed

12  to any juror who failed to follow proper standards of conduct before or during deliberations, nor has

13  Petitioner identified anything in the trial proceedings that would suggest, even remotely, that the

14  failure to administer the oath and obtain the prospective jurors' acknowledgments at the

15  commencement of voir dire had any effect on the conduct of the trial or its outcome.  As such,

16  Petitioner's argument remains a legal abstraction which does not merit federal habeas relief.  Under

17  these circumstances, the Court  concludes that the trial court's error did not have a substantial and

18  injurious effect in determining the jury's verdict, and thus any error is harmless.

19      Based on the foregoing, the Court concludes that the state court's rejection of this claim was

20  not contrary to, or an unreasonable application of, clearly established federal law.  Accordingly,

21  Ground One must be denied.

22

23

---

24      [4]The Court notes that in his petition, Petitioner did not cite any federal law or federal
    constitutional right implicated by the trial court's purported error in Ground One.  In his traverse, for the
25  first time, Petitioner makes a single, vague reference to the denial of a "constitutional right to due
    process." (Doc. 13, p. 6).  However, such a broad, conclusory reference is not sufficient to transform
26  an otherwise improper state law claim into a proper claim on federal habeas review.  Jones v. Gomez,
    66 F.3d 199, 205 (9th Cir.1995); Greyson v. Kellam, 937 F.2d 1409, 1412 (9th Cir. 1991) (bald
27  assertions of ineffective assistance of counsel did not entitle the petitioner to an evidentiary hearing);
    see also Hiivala v. Wood, 195 F.3d 1098, 1106 (9th Cir.1999) (citing Gray v. Netherland, 518 U.S.
28  152, 162-63 (1996) ("general appeals to broad constitutional principles, such as due process, equal
    protection, and the right to a fair trial, are insufficient to establish exhaustion)).

**Ground 2.      The prosecution failed to investigate and/or failed to disclose**
**exculpatory evidence favorable to Petitioner violating his**
**constitutional rights secured by the Sixth and Fourteenth**
**Amendments of the United States Constitution.**

Petitioner alleges that the prosecution failed to disclose Athena Hipp's prior drug convictions

and made a strategic decision not to call her as a witness in order to avoid having the jury learn of

her prior drug history through impeachment cross-examination. (Doc. 1, p. 10). Thus, in

Petitioner's view, the prosecution wrongfully withheld exculpatory information which was

"reasonably probable" to affect the jury's decision on the drug possession charge, and thereby

violated Petitioner's rights to due process and a fair trial. (Id.).

The Due Process Clause of the Fourteenth Amendment requires the prosecution to disclose to

criminal defendants favorable evidence that is *material* either to guilt or to punishment. United

States v. Agurs, 427 U.S. 97, 96 S. Ct. 2392 (1976); Brady v. Maryland, 373 U.S. 83, 83 S. Ct.1194

(1963). Evidence is material and must be disclosed "if there is a reasonable probability that, had the

evidence been disclosed to the defense, the result of the proceeding would have been different."

United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375 (1985). A "reasonable probability" is a

probability sufficient to undermine confidence in the outcome of the trial. Id. A defendant's due

process rights are violated if prosecutorial misconduct renders a trial "fundamentally unfair," i.e., if

the misconduct so infected the trial with unfairness as to make the resulting conviction a denial of

due process. Darden v. Wainwright, 477 U.S. 168, 183, 106 S. Ct.2464 (1986); Drayden v. White,

232 F.3d 704, 711 (9th Cir.2000). The Ninth Circuit has stated that prosecutorial misconduct violates

due process only if evidence is presented which "taken as a whole" gives a jury a "false impression."

Downs v. Hoyt, 232 F.3d 1031, 1038 (9th Cir.2000) (quoting Alcorta v. Texas, 355 U.S. 28, 31, 78 S.

Ct. 103 (1957) (per curiam)).

Applying these principles to the record in this case, the Court concludes that Petitioner's

contentions are without merit. Hipp was a passenger in Petitioner's vehicle. Although the

prosecution listed Hipp as a witness, it did not call her to testify. Whether the prosecution was

concerned that Hipp might admit owning and throwing out the drugs, or whether the prosecution was

confident that its case was sufficiently strong without Hipp's testimony, the prosecution was under

1   no duty to call Hipp to testify, and Petitioner cites no authority that would have required the
2   prosecution to do so.  The only evidentiary value of Hipp's criminal history was to impeach her
3   credibility, i.e., to cross-examine Hipp on any relevant subject, including possible bias or interest
4   resulting from inducements made by the government.  United States v. Bagley, 473 U.S. at 678.
5   However, since the prosecution never called Hipp to testify, the question of using her prior criminal
6   history to impeach her testimony never arose.

7          Petitioner also had the right to call Hipp as a defense witness, but failed to do so.  It is
8   plausible to assume that this was because he feared she would deny, rather than admit, being the
9   person who threw the contraband out of Petitioner's car during the chase, thus directly implicating,
10  rather than exculpating, Petitioner.  Such testimony would directly contradict the strongest defense
11  evidence, i.e., the testimony of Wesley Gibson, the other passenger in Petitioner's vehicle.  Gibson
12  had testified that he had just met Hipp, a prostitute, when the two were given a ride by Petitioner,
13  whom they did not previously know.  (RT 323-324).  Gibson testified that Hipp was the person who
14  threw the contraband out of Petitioner's car.  (RT 325).  He also indicated that a syringe "rolling
15  around on the floor" also belonged to Hipp.  (RT 325).  Gibson testified that he never saw Petitioner
16  throw anything out of the car window.  (RT 326).

17         In light of this strong testimony for the defense, Petitioner could have made a strategic
18  decision that if Hipp had denied owning the drugs, that testimony could completely undermine the
19  exculpatory impact of Gibson's testimony.  Petitioner does not offer, and the Court is unaware of,
20  any other avenues for introducing evidence of Hipp's drug history without calling her as a witness.
21  Thus, in light of the significant constraints on impeaching Hipp, it is not reasonably probable that
22  evidence of Hipp's prior drug history would have led to a different outcome, not did its non-
23  disclosure, when taken as a whole, give the jury a false impression.

24         Based on the foregoing, the Court concludes that the state court's rejection of this claim was
25  not contrary to, or involve an unreasonable application of, clearly established Federal law.
26  Accordingly, Ground Two must be denied.

27  ///

28  ///

**Ground 3.     Defense counsel failure to provide effective assistance of counsel which violated Petitioner's Sixth Amendment rights secured by the United States Constitution.**

1.  The Standard for Ineffective Assistance of Counsel.

To establish ineffective assistance of counsel, Petitioner must show both that his counsel's representation "fell below an objective standard of reasonableness" and that her deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 691, 105 S. Ct. 3375 (1985); McClure v. Thompson, 323 F. 3d 1233, 1241 (9th Cir. 2003), cert. denied, 540 U.S. 1051, 124 S. Ct. 804 (2003).

To show that his counsel's representation fell below an objective standard of reasonableness, Petitioner must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1347-48 (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, or "sound trial strategy." Strickland, 466 U.S. at 689; Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994).

To show prejudice under Strickland, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Because Petitioner is challenging his conviction, the Court must consider whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. Id. at 695.

The Court does not need to consider the two Strickland factor in any particular order, nor does the Court need to consider both if the showing on either one is insufficient. Id. at 697. A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Id.  The object of an ineffectiveness claim is not to grade counsel's performance. Id. "If it is easier to dispose of an ineffective claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be

followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to
defense counsel that the entire criminal justice system suffers as a result." Id. With these principles
in mind, the Court now turns to an analysis of each of Petitioner's seven claims of ineffective
assistance of counsel.

2. Petitioner's Grounds for Ineffective Assistance are Without Merit.

a. Failure to Call Hipp as a Witness.

Petitioner alleges that trial counsel was ineffective because she failed to interview and then
call passenger Hipp as a witness because, in doing so, Hipp's prior drug-related convictions would
have been revealed, thus creating a reasonable doubt regarding whether Petitioner had thrown the
drugs out of the car window during the pursuit by police. (Doc. 1, p. 11).

As Respondent points out, however, the insurmountable obstacle Petitioner faces in this
contention is that there is no evidence to support his assumption that Hipp's testimony would have
corroborated Gibson's testimony that Hipp, not Petitioner, had thrown the drugs out of the vehicle.
Petitioner submitted no affidavits to indicate how Hipp might have testified had she been called as a
witness, and therefore any speculation regarding the nature of Hipp's testimony remains mere
speculation.

This very uncertainty is fatal to Petitioner's claim. If defense counsel could not be certain
whether Hipp's testimony would be exculpatory or inculpatory, then she clearly could have decided,
strictly as a strategic reason, not to call Hipp as a defense witness. Strickland, 466 U.S. at 690
(defense attorney's decisions made after thorough inquiry are "virtually unchallengable"); Roe v.
Flores-Ortega, 528 U.S. 470, 481, 120 S. Ct. 1029 (2000) ("The relevant question is not whether
counsel's choices were strategic, but whether they were reasonable."). On these facts, competent
trial counsel reasonably could have concluded that her client's best interests required not calling
Hipp as a defense witness. Accordingly, the Court cannot conclude that counsel's performance was
deficient or that her decisions regarding Hipp were unreasonable. Strickland, 466 U.S. at 687-90.

The record in this case also fails to demonstrate that, even if deficient, counsel's performance
was prejudicial. Petitioner's assertions that "[c]alling Hipp would have meant her convictions would
have been revealed...," and that the absence of such evidence prejudiced Petitioner (Doc. 1, p. 11),

1   are untenable. *If* the defense had called Hipp, and *if* she had testified in favor of the defense, it is

2   extremely unlikely that the defense would then have impeached its own witness in order to impugn

3   her credibility. It is likewise doubtful that the prosecution would have done so, because attempting

4   to impeach Hipp's claim that the drugs were hers by introducing evidence of her prior drug history

5   would have had the reverse effect of supporting, rather than undermining, her testimony.

6        On the other hand, if Hipp had testified that Petitioner, not she, had thrown out the drugs, the

7   defense would then have been in the untenable position of having to impeach its own witness in

8   order to mitigate the damage her testimony would have caused the defense. Thus, under either

9   scenario, defense counsel's failure to find a means to introduce Hipp's drug history was not

10  prejudicial. Petitioner's assertion of prejudice is plausible only in the unrealistic scenario in which

11  he could have somehow have introduced Hipp's drug history without actually calling her as a witness

12  and thereby running the risk of eliciting testimony potentially devastating to the defense.

13       Moreover, the jury was instructed that Petitioner's possession of heroin could either be

14  "actual" or "constructive." (CT 197). The jury was instructed that "constructive possession" does

15  "not require actual possession but does require that a person knowingly exercise control over or the

16  right to control a thing, either directly or through another person or persons." (Id.). Given the

17  undisputed testimony by both Officers Sousa and Wagner that the driver, later identified as

18  Petitioner, threw the bag out of the vehicle, even if, as Gibson testified, the drugs belonged to Hipp,

19  the jury could reasonably have concluded that Petitioner was guilty of constructive possession by

20  virtue of throwing the drugs out of his car. Hence, even if Hipp had testified to ownership of the

21  heroin, Petitioner could have been convicted under the alternative "constructive possession" theory.

22       Finally, Petitioner's assertion that trial counsel was ineffective in failing to interview Hipp is

23  unsupported by the record, which is silent about trial counsel's pre-trial preparation regarding Hipp.

24  Even assuming, arguendo, that it would be unreasonable for counsel not to interview Hipp before

25  trial, absent some evidence that counsel actually failed to meet this standard, the Court cannot find

26  counsel's conduct deficient. Moreover, as discussed above, it cannot be concluded that the failure to

27  interview Hipp before trial prejudiced Petitioner or affected the outcome. Even if trial counsel had

28  learned of Hipp's prior history, this knowledge would not have aided Petitioner's defense given the

1  strategic dilemma that calling her as a witness would have entailed.

2      Thus, Petitioner has not overcome the presumption that counsel's performance was within
3  the wide range of reasonable assistance and that she exercised acceptable professional judgment in
4  all significant decisions made.  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990).  Federal habeas
5  courts cannot second-guess counsel's strategic decision to present or forego a particular defense
6  theory or approach that appears reasonable under the circumstances.  United States v. Chambers,
7  918 F.2d 1455, 1461 (9th Cir. 1990).

8      b.  Failure to Retain a Fingerprint Expert Witness.

9      Petitioner next alleges that trial counsel was ineffective in failing to retain the services of a
10  fingerprint expert to conduct fingerprint analyses of the retrieved packet of drugs and the syringe
11  recovered from the vehicle.  (Doc. 1, p. 13).  Implying that such tests would exculpate him,
12  Petitioner alleges that a "simple fingerprint analysis would correct Petitioner's unjust conviction."
13  (Id.).  As support for this argument, Petitioner submits a letter from a fingerprint expert as an
14  attachment to his petition.  (Doc. 1, correspondence from Kurt E. Kuhn, attached as exhibit to
15  petition).

16      Kuhn's letter does little to advance Petitioner's claim.  Kuhn advised Petitioner not to pursue
17  testing of the plastic bag because, as an expert, he had testified on numerous occasions that a person
18  could handle wet plastic without leaving prints.  (Id.).  Kuhn reasons that because the drugs were
19  thrown onto the wet pavement, there would be no guarantee that, even if Hipp had handled the bag,
20  her prints could be recovered through testing.  (Id.).

21      Thus, even according to Petitioner's evidence, such a test would not have had the potential to
22  either exclude or inculpate Hipp as the owner of the drugs.  Nor has Petitioner offered any other
23  evidence that would suggest to this Court that, if such tests had been performed at trial counsel's
24  request, exculpatory evidence, e.g., Hipp's fingerprints, would probably have been recovered from
25  the plastic bag.  Given that the bag was in a car with three persons, it is conceivable that any of them
26  could have handled the bag at some point without being the actual "owner" or "user" of the drugs
27  under California criminal law.  That being the case, trial counsel could have had a strategic reason
28  for not undertaking forensic fingerprint testing of the plastic bag.

1      Finally, even if trial counsel's failure to undertake such tests met the first prong of Strickland,
2  Petitioner has shown no prejudice.  Gibson's testimony established the defense position that Hipp
3  owned the drugs and discarded them.  Hipp's fingerprints alone would not have established
4  ownership or possession by Hipp.  Nor could such a test have established that Hipp was the
5  individual who threw the drugs out of the vehicle; at best, the test could have established merely that
6  Hipp had handled the bag at some point in time.  Only first-hand, eyewitness testimony, such as that
7  provided by Gibson, could establish such facts.  Since that testimony was already in front of the jury,
8  the failure to conduct fingerprint tests of the bag would not have affected the outcome of the case.[5]
9  Accordingly, Petitioner has failed to show that he was prejudiced by his counsel's failure to retain a
10  fingerprint expert witness.

11      c.  Failure to Properly Investigate Crime Scene.

12      Petitioner contends that defense counsel should have conducted an independent crime scene
13  investigation that could have shown that debris blown into the area from surrounding developments
14  could have been the origin of the drug packet attributed to Petitioner.  (Doc. 1, p. 14).  Petitioner also
15  contends that trial counsel failed to move a highway map into evidence.  (Id.).  Petitioner's claims
16  fail to satisfy either of the two Strickland prongs.

17      Defense counsel has a "duty to make reasonable investigations or to make a reasonable
18  decision that makes particular investigations unnecessary."  Strickland, 466 U.S. at 691.  Here, trial
19  counsel's decision not to investigate the crime scene was reasonable.

20      Officer Wagner saw an object thrown out of the driver's side of the car in the vicinity of
21  where it was ultimately recovered.  (RT 146).  Officer Wagner saw no movement by the two
22  passengers when the item was discarded, and testified that the passengers did not throw the item out
23  the window, leading him to conclude that it was thrown out by Petitioner.  (RT 147, 171).  Officer
24  Sousa saw the driver stick his left hand out of the window and toss a white piece of paper or plastic.
25  (RT 224).  Officer Sousa saw the driver's hand out of the window making a flicking motion from
26  right to left.  (RT 225).  Officer Wagner testified the police car was "fairly close behind" Petitioner's

27

28      [5] The same reasoning and result applies to Petitioner's argument that trial counsel was ineffective
in failing to conduct a fingerprint test on the syringe found in Petitioner's vehicle.  (Doc. 1, p. 13).

1  vehicle when the item, which he also described as a "small white-looking piece of paper or plastic,"
2  was ejected. (RT 146). About 15-20 minutes after apprehending Petitioner, Officer Sousa returned
3  to the area where the bag had been thrown out and recovered it within about fifteen minutes of
4  beginning his search for it. (RT 230-231). Officer Sousa testified that most of the debris in the area
5  was saturated with water, but the plastic bag was "relatively dry." (RT 231).

6  The jurors could either believe or disregard this evidence and could judge for themselves, as
7  fact finders, the likelihood that the bag retrieved by the police officers from the median was the same
8  object the police officers observed being thrown out of Petitioner's vehicle. It is difficult to imagine,
9  however, how the introduction of evidence about the roads and homes in the surrounding
10 neighborhoods would be either relevant or probative of the question of the bag's ownership. Thus,
11 trial counsel's conduct was not deficient.

12 Moreover, Petitioner has shown no prejudice. Petitioner has not pointed to any specific
13 evidence that trial counsel could have uncovered in a crime scene survey might have aided
14 Petitioner's defense. Rather, Petitioner speculates that "it is as likely that the item recovered came
15 from another vehicle, or was blown onto the highway from the residential area shown by the map."
16 (Doc. 1, p. 14).

17 The jurors were free to draw from the evidence a reasonable inference that the drugs found by
18 the officers had come from some other source than Petitioner's vehicle, e.g., from another vehicle,
19 from a pedestrian passing by, or even, as Petitioner suggests, from debris blown into the area from
20 adjacent neighborhoods. The jurors did not require expert testimony in order to draw such an
21 inference; rather, it is implicit in the very facts that were already in evidence.[6] Introducing a map
22 into evidence, or eliciting expert testimony about the number of homes or roads in the vicinity,
23 without additional testimony that would establish some direct causal link between the drugs and the
24 nearby homes or roads, would be meaningless, speculative, and no more probative of Petitioner's

25

26  [6] In her closing argument, Petitioner's counsel did argue that, given the large amount of debris
27  on the roadside, and given that officers had seen "something" thrown out of Petitioner's vehicle, the
    officers would have assumed that virtually anything incriminating that was found on the roadside had
28  been thrown from the vehicle. (RT 360).

innocence than the evidence that had already been adduced.  Moreover, Petitioner has proffered no affidavits or other evidence identifying anyone that would have been prepared to testify that the geography or development of the area could create a reasonable doubt about the source of the drugs. Thus, Petitioner has not established prejudice.

d. Failure to Cross-Examine Prosecution Witnesses.

Petitioner cites six specific examples where defense counsel could have asked specific questions on cross-examination that might have been helpful to Petitioner's defense.  (Doc. 1, pp. 14-15).  All of the proposed questions are directed toward the police officers and concern their pursuit and arrest of Petitioner.  (Id.).

Giving trial counsel the latitude to make strategic choices in her professional representation of Petitioner, the Court cannot say that trial counsel's performance was deficient merely because she failed to ask the specific questions Petitioner would have asked.  Additionally, it bears emphasis that trial counsel did cross-examine these two witnesses quite thoroughly.  (RT 167-205, 217-221, 236-251, 254-258, 259-260).

However, even if counsel's performance was deficient, Petitioner was not prejudiced.  The officers testified about the circumstances of their pursuit and arrest of Petitioner, the conditions and opportunities to observe the vehicle during the pursuit, and their versions of how the drugs were ejected from the vehicle.  Gibson testified that Hipp owned the drugs and threw them out of the car. Under those circumstances, any additional details that might have been elicited had trial counsel asked the questions Petitioner now suggests, would have had only a de minimis effect on the state of the evidence.  Such details could not, as matter of law, have benefitted the defense in any significant way. Nor is it reasonably probable that they would have led to a different outcome.

e. Failure to Sever Charges.

Petitioner contends that the joinder of the specific intent crime of evading a police officer with the drug charge hampered Petitioner's defense because being under the influence of drugs, while useful as a defense to the evading charge, would have helped persuade jurors that the discarded drugs belonged to Petitioner.  (Doc. 1, p. 15).

///

California has a "strong legislative policy in favor of joinder of charges unless there is prejudice." People v. Gomez, 24 Cal.App.4th 22, 28, 29 Cal. Rptr.2d 94 (1994). Under California law, a motion to sever properly joined offenses *may* be granted if: 1) the evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; 2) certain of the charges are unusually likely to inflame the jury against the defendant; 3) a 'weak' case has been joined with a 'strong' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and 4) any one of the charges carry the death penalty or joinder of them turns the matter into a capital case." People v. Kraft, 23 Cal.4th 978, 1031, 99 Cal. Rptr. 2d 1 (2000), quoting People v. Bradford, 15 Cal.4th 1229, 1315, 65 Cal. Rptr.2d 145 (1997).   A defendant can establish error by demonstrating that the statutory elements justifying consolidation are absent, i.e., that all of the alleged offenses are not of the same class, or by a clear showing of potential prejudice. Kraft, 23 Cal.4th at 1030-1031.

Here, both offenses arose out of the same set of operative facts, i.e., Petitioner's flight and subsequent discarding of the drugs, both of which were directly related to Petitioner's understandable concern, as a potential Three Strikes defendant, about being stopped with contraband in his possession. However, even assuming, arguendo, that the offenses were not of the same "class," Petitioner has demonstrated no prejudice. He has asserted no legal basis on which it can be concluded that the evidence relating to one charge would not be admissible at a severed trial on the other charge. Indeed, it is highly probable that evidence of flight, and the conditions and circumstances of that flight, would be admissible in any separately tried prosecution for possession of drugs. See People v. Pensinger, 52 Cal.3d 1210, 1245, 278 Cal. Rptr.640 ("Obviously a flight instruction is correctly given when there is substantial evidence of flight by the defendant...from which the jury could reasonably infer a consciousness of guilt."). Accordingly, any complaint by Petitioner that he was prejudiced by trial counsel's failure to request severance is based upon sheer speculation.

Moreover, neither crime is of a particularly inflammatory nature. See People v. Daly, 8 Cal. App. 4th 47, 56, 10 Cal. Rptr.2d 21 (1992) (joining robbery, kidnapping, and attempted murder was not inflammatory). Finally, neither case was significantly "stronger" than the other. The Court

1  concludes that Petitioner has failed to establish ineffective assistance of his trial counsel in failing to

2  move for a severance.

3      f. Failure to Review Documents for Sentencing.

4      Petitioner contends that his trial counsel was ineffective in failing to review all pertinent

5  documents relating to his prior criminal history. (Doc. 1, p. 16). The gravamen of Petitioner's claim

6  is that his trial counsel failed to adequately review transcripts of guilty pleas leading to prior

7  convictions, thus depriving Petitioner of the opportunity to argue that the pleas were

8  unconstitutionally obtained. (Id.).

9      As Respondent notes, in Lackawanna County District Attorney v. Coss, 532 U.S. 394, 121

10 S. Ct. 1567 (2001), the Supreme Court extended to habeas petitions under 28 U.S.C. § 2254 its

11 holding in Daniels v. United States, 532 U.S. 374, 382, 121 S. Ct. 1578 (2001), to wit: if the prior

12 conviction used to enhance a sentence is no longer open to direct or collateral attack in its own right,

13 it may not be collaterally attacked in a motion under 28 U.S.C. § 2255. Lackawanna, 532 U.S. at 402.

14 The only exception is "where there was a failure to appoint counsel in violation of the Sixth

15 Amendment...." Id. at 404.

16     Lackawanna forecloses Petitioner's argument of ineffective assistance of trial counsel.

17 Although the issue of ineffective assistance of trial counsel in failing to challenge a prior conviction

18 during a sentencing enhancement proceeding does not directly challenge the prior conviction, in order

19 to establish prejudice it would be necessary to show that but for the trial attorney's error in not

20 challenging the prior conviction, there is a reasonable probability of a different outcome. Strickland,

21 466 U.S. at 694. A necessary predicate to establishing the probability of a different outcome in these

22 circumstances is showing that the prior conviction is constitutionally deficient, something that

23 Lackawanna holds is improper in a habeas proceeding. Moreover, although the claim of ineffective

24 assistance here is somewhat derivative of the claim of challenging the underlying prior conviction,

25 which is the precise situation addressed in Lackawanna, the public policies underlying the prohibition,

26 i.e., the finality of convictions and ease of administration, Lackawanna, 532 U.S. at 402, are both as

27 applicable in the context of an ineffective assistance of counsel claim as they are in the context of a

28 challenge to the prior convictions themselves. Accordingly, this claim must be rejected.

g.  Failure to Meet with Witnesses and Consult with Petitioner Before Trial.

Finally, Petitioner alleges that trial counsel was ineffective because she failed to meet with and interview witnesses, including Petitioner, before trial.  (Doc. 1, p. 17).  Petitioner notes that trial counsel should have made particular efforts to meet with Petitioner prior to trial in order to discuss all relevant facets of the case and that the failure to do so "created a situation of doom from the start." (Id.).

However, Petitioner points to no specific instances that support his claim.  He cites no particular witnesses that counsel should have interviewed before trial, he does not explain how the witnesses's testimony would have been different, or more favorable, had such consultation occurred, nor does he identify any prejudice resulting from these alleged deficiencies.  To the extent that Petitioner is referring to witnesses already discussed in previous sections, e.g., Hipp, those issues have already been addressed by the Court.  To the extent that Petitioner is referring to other, unnamed witnesses, the argument fails to specify what deficiencies he is alleging in trial counsel's conduct. The Court will not speculate about possible prejudice from such vague and amorphous allegations.

h.  Conclusion.

The state court denied Petitioner's claims for ineffective assistance of trial counsel as being "internally contradictory and vague." (Doc. 5, Exh. H). Although the state court did not elaborate, this Court construes the state court's decision to be premised on Petitioner's failure to articulate  sufficient factual and legal bases for his claims of ineffective of  counsel. Based on the foregoing analysis of Petitioner's claims, this Court agrees with the state court's decision.

The Court must exercise a strong presumption that trial counsel's conduct falls "within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d at 702; Strickland, 466 U.S. at 690 ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of professional judgment").  To satisfy the prejudice requirement, Petitioner must show a reasonable probability that, absent the errors of counsel, the jury would have had a reasonable doubt regarding his guilt. Id. at 695.  Relying exclusively on arguments premised on speculation and second-guessing, Petitioner has failed to overcome the presumption that his counsel's

performance was within the wide range of reasonable assistance and that she exercised acceptable

professional judgment in her representation of Petitioner.  Hughes, 898 F.2d at 702.

Based on the foregoing, the Court concludes that the state court's decision was not contrary to,

or involve an unreasonable application of, clearly established Federal law.  Accordingly, Petitioner's

claims of  ineffective assistance of counsel must be denied.

**Ground 4.   Petitioner did not waive arraignment for judgment and the court erred by improperly considering juvenile information in the probation report, a January 17, 1986 conviction not supported by the evidence, and failed to properly pronounce judgement by not citing any prior convictions which resulted in an improper sentence.  Such actions violated petitioner's Fourteenth Amendment rights secured by the United States Constitution.**

Petitioner alleges that the trial court failed to arraign Petitioner before sentencing, an alleged

error that included the court's failure to make a specific finding regarding two prior convictions, that

the trial court erroneously considered Petitioner's juvenile conviction contained in the probation

report, and that there was insufficient evidence of a first-degree burglary conviction alleged in the

information.  (Doc. 1, pp. 19-21).  The Court will consider each of these contentions in turn.

1.  Arraignment.

Petitioner first contends that the trial court failed to arraign him before sentencing.  (Doc. 1, p.

19).  This is purely a state law issue that is not cognizable in a federal habeas proceeding.  Engle, 456

U.S. at 120 fn 21, ("We have long recognized that a mere error of state law is not a denial of due

process." (citations and internal quotation marks omitted)).  Although the caption to Ground Four

asserts a violation of the Fourteenth Amendment, Petitioner fails to assert this violation in his

explanation of this issue.  In any event, the transcript of the sentencing hearing contains a statement

by the trial court that Petitioner "has waived formal arraignment."  (RT 437).  Neither defense

counsel nor the prosecution objected to or took issue with the court's representation in this regard.

Thus, while the waiver itself may not be reflected in the reporter's transcript, it seems evident from

the trial court's statement, as well as from the implicit agreement with that statement by both the

prosecutor and defense counsel, that at trial the parties did not dispute that such a waiver occurred.  It

is not now for this Court to speculate about why the actual waiver itself is not reflected in the record.

It is sufficient that the parties' attorneys and the trial court agreed that it had been properly given. That being the case, Petitioner's contention that the record does not support any such waiver is unavailing. (Doc. 1, p. 19).

Finally, even if the court failed to arraign Petitioner, and even if it were federal error, Petitioner has failed to show that it had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623. Hence any such error was harmless.

2. Juvenile Record.

Petitioner contends that the trial court erred in considering Petitioner's juvenile history, as reflected in the probation report, when imposing the sentence. (Doc. 1, p. 19). Initially, the Court notes that this is purely a question of state law. As such, it is not cognizable in this habeas proceeding since it does implicate any federal constitutional right. Engle, 456 U.S. at 119.    Moreover, the record in this case does not support Petitioner's contention that a state law violation occurred. Petitioner has not cited any state law that precludes a trial court from considering a defendant's prior juvenile history as part of the sentencing considerations. Probation reports prepared in California routinely contain not only juvenile adjudications but also juvenile contacts with police that do not even result in formal juvenile proceedings.

Petitioner's reliance on California Welfare and Institutions Code § 389 is misplaced. (Doc. 1, p. 19). Welfare and Institutions Code § 389 merely provides for the sealing of juvenile records under certain circumstances and upon application of the juvenile. It imposes no bar on a probation officer including, and a trial court considering, a defendant's juvenile history when, as here, that history has not been sealed.

Finally, even assuming, arguendo, that review of Petitioner's juvenile record was an error rising to the level of a federal issue, it was harmless. Contrary to Petitioner's assertion, it is far from "clear" that "the information impacted the trial court's consideration of sentence." (Doc. 1, p. 19). Except for a brief reference made during the sentencing hearing when the trial court mentioned that Petitioner had been "busy criminally" since his juvenile adjudication for burglary (RT 436), the trial court made no further mention of Petitioner's juvenile history in a fairly lengthy discussion of the court's sentencing rationale. (RT 433-439). The Court finds no basis for concluding that the trial

court's error in considering Petitioner's juvenile background, even if federal error, "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623. Under such circumstances, any error was harmless.

3. Insufficient Evidence of Prior Burglary Conviction.

Petitioner asserts that the record does not establish that Petitioner was convicted of a January 17, 1986 first-degree burglary as alleged in the original criminal information. (Doc. 1, p. 19). Apparently in the alternative, Petitioner argues that no transcript of the conviction, which is the "preferred evidence" to prove a prior conviction, was introduced during the penalty phase,. (Doc. 1, p. 19). Finally, it appears that Petitioner contends that the trial court did not make its findings, or repeat its findings, during the pronouncement of sentence. (Doc. 1, p. 20). None of these contentions has merit.

The parties stipulated that the individual referred to in the California Penal Code § 969b "prison packet," which was the only evidence presented by the prosecution in the penalty phase, was in fact Petitioner. (RT 418). Thus, the only issue was whether the 969b packet itself contained sufficient evidence to support a finding that Petitioner had been convicted of two prior "strikes." It did.

The original criminal information listed two prior "strike" convictions as occurring respectively on January 17, 1986, in case no. H7860B, and September 21, 1987, in case no. H9324A, both in Alameda County, California. (CT 35-36). Petitioner's California Department of Corrections records the "969b" packet contained Petitioner's fingerprint card in case no. H7860B and the abstract of judgment for that case (CT 302, 312). The latter indicates that January 17, 1986 was the date of the sentencing hearing, and that Petitioner had entered a plea on December 9, 1985, which is incorrectly listed in the abstract of judgment as the date of conviction. (CT 312). Based on this evidence, the trial court found that Petitioner had committed two prior first-degree burglaries in 1986 and 1987 in Alameda County, California. (RT 420).

Petitioner did not challenge the authenticity of the evidence in the 969b packet during the hearing on the prior convictions. Until the instant federal petition was filed, Petitioner had neither disputed the fact that he was convicted of first degree burglary in Alameda County in 1986, nor

1   framed the apparent typographical error in the information as a lack of notice issue that prejudiced
2   him at sentencing.

3        Nevertheless, Petitioner now contends that the allegedly insufficient quantum of evidence of
4   his 1986 conviction, and the trial court's purported failure to make a specific reference to the two first
5   degree burglary convictions during the pronouncement of sentence, are not only state law errors, but
6   are sufficiently egregious to violate his due process rights. Other than using the catch-all phrase "due
7   process" in his caption, Petitioner has not articulated the constitutional nature of his claim based on
8   insufficiency of the evidence.

9        Petitioner's broad assertion of "due process" does not transform this claim into a federal one.
10   Merely placing a "due process" label on an alleged error does not entitle Petitioner to federal relief.
11   Langford v. Day, 110 F.3d 1386, 1388-89 (1996). Broad, conclusory allegations of unconstitutionality
12   are insufficient to state a cognizable claim. Jones v. Gomez, 66 F.3d at 205; see Greyson v. Kellam,
13   937 F.2d at 1412 (bald assertions of ineffective assistance of counsel did not entitle the petitioner to
14   an evidentiary hearing); see also Hiivala v. Wood, 195 F.3d at 106 (citing Gray v. Netherland, 518
15   U.S. at 162-63 (general appeals to broad constitutional principles, such as due process, equal
16   protection, and the right to a fair trial, are insufficient to establish exhaustion)). The insufficiency of
17   the evidence claim, as framed by Petitioner, is exclusively a state law claim which is not cognizable in
18   a federal habeas corpus proceeding.   Engle v. Isaac, 456 U.S. at 112, fn 21.

19        Even if Petitioner's claim were cognizable, however, it is without merit. In reviewing
20   sufficiency of evidence claims, California courts expressly follow the standard enunciated in Jackson
21   v. Virginia, 443 U.S. 307, 99 S.Ct. 278 (1979); see People v. Johnson, 26 Cal. 3d 557, 575-578, 162
22   Cal. Rptr 431 (1980); see also People v. Thomas. 2 Cal 4th 489, 513, 7 Cal. Rptr. 2d 199 (1992). The
23   test in determining whether a factual finding is fairly supported by the record is "whether, after
24   viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could
25   have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319;
26   see Lewis v. Jeffers, 497 U.S. 764, 781, 110 S.Ct. 3092 (1990).

27        This Court must presume the correctness of the state court's factual findings. 28 U.S.C.
28   § 2254(e)(1);   Kuhlmann v. Wilson, 477 U.S. 436, 459, 106 S. Ct. 2616 (1986). This presumption of

correctness applies to state appellate determinations of fact as well as those of the state trial courts. Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir.1990). Although the presumption of correctness does not apply to state court determinations of legal questions or mixed questions of law and fact, the facts as found by the state court underlying those determinations are entitled to the presumption. Sumner v. Mata, 455 U.S. 539, 597, 102 U.S. 1198 (1981); Lambert v. Blodgett, 393 F.3d at 976.

Petitioner fails to demonstrate that the state court's finding that he had suffered a prior "strike" conviction in 1986 was contrary to or involved an unreasonable application of clearly established federal law. The evidence presented to the state court, acting as the factfinder, was reviewed *supra*. Considering that evidence in the light most favorable to the prosecution, it is apparent that a rational trier of fact, i.e., in this case the trial court, could have found beyond a reasonable doubt that Petitioner had been convicted of the 1986 robbery. Jackson, 443 U.S. at 319.

The state court finding is presumed correct. Petitioner has not shown the rejection of this claim to be contrary to or involve an unreasonable application of clearly established federal law. The the claim should be denied.

Moreover, Petitioner's contention that the trial court failed to state the findings during the pronouncement of sentence is misguided. During the sentencing hearing, the trial court made factual findings that the allegation of a 1986 prior strike conviction for first degree burglary was true. (RT 420). Additionally, the attorneys argued a motion to strike one or both of the two "strike" convictions and the trial court ruled on that motion. (RT 427-437). The court then went on to discuss the two prior first-degree burglary convictions that were used as "strikes". (RT 433). The court then stated the "indicated" sentence of twenty-five years to life for the third "strike" conviction. (RT 438). Finally, the trial court asked counsel if there were any errors of law or fact in the indicated sentence the court had made; Petitioner's counsel indicated that there were none. (RT 439-440). Only at this point did the trial court impose the sentence it had previously indicated. (RT 440).

From this chronology, it is apparent that the trial court correctly included the two prior strike enhancements within the pronouncement of sentence. Petitioner's reliance upon People v. Hartsell, 34 Cal. App.3d 8, 109 Cal. Rptr. 627 (1973), is misplaced. In Hartsell, despite a finding at trial that defendant had committed two prior "strikes," at sentencing the trial court omitted any reference to the

1    prior convictions and the transcript and minutes of the hearing contained no reference to the prior
2    convictions. Hartsell, 34 Cal.App.3d at 11-13. The trial court sentenced defendant to a term
3    consistent with the current conviction. Id. The abstract of judgment prepared afterward listed the
4    prior convictions. Id. The California Court of Appeal held that where the trial court fails to refer in
5    any way to the prior convictions at sentencing, it cannot later modify the judgment by adding that
6    information to the abstract of judgment. Id.

7         The situation in the instant case is readily distinguishable from Hartsell since the trial court
8    here made several references to Petitioner's prior convictions during the sentencing. Further, the state
9    statutes cited by Petitioner do not require a different result. California Penal Code §§ 1191, 1193,
10   1202, and 1203, all deal with various aspects of conducting sentencing hearings. None of these
11   provisions, however, concern the specific issue raised here by Petitioner. Accordingly, they are
12   inapplicable.

13        Additionally, it bears emphasis that prior to the sentencing hearing, defense counsel submitted
14   a sentencing memorandum which began by recounting the jury verdicts in the case and the trial
15   court's subsequent finding that Petitioner had suffered two prior strike convictions. (CT 223).
16   Attached to that memorandum is a handwritten letter from Petitioner addressed to the
17   "3 Strikes Committee" and in which Petitioner requests leniency despite his prior two "strike"
18   convictions. (CT 276- 280). The pre-sentence probation report indicates that Petitioner
19   acknowledged the court's findings as to the two "strikes," but indicated to the probation officer that
20   he believed "the three strikes law was written for persons with violent criminal histories" and that
21   "although his criminal history is lengthy, he should not be considered a violent criminal." (CT 217).
22   Thus, from a due process perspective, Petitioner cannot successfully maintain that he lacked notice
23   that he was being sentenced under California's Three Strikes law.

24        Based on the foregoing, the Court  was not contrary to, or an unreasonable application of,
25   clearly established federal law. Accordingly, Ground Four must be denied.

26   ///
27   ///
28   ///

**Ground 5:   The imposition of California's "3-strike" law sentence in this matter is so grossly disproportionate to the crimes that it violates the Eighth Amendment.**

Petitioner contends that his sentence of 28 years to life violates the federal prohibition against cruel and unusual punishment contained in the Eighth Amendment to the United States Constitution. (Doc. 1, p. 21). This contention is without merit.

In two recent companion cases, Lockyer v. Andrade, 538 U.S. 63, and Ewing v. California, 538 U.S. 11, 123 S. Ct.1179 (2003), the Supreme Court provided guidance in applying Eighth Amendment jurisprudence to California's Three Strikes Law in habeas cases.  In Ewing, the Supreme Court explained that while the constitutional principle of proportionality between crime and sentence applies to noncapital sentences, "[t]he Eighth Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime."  Ewing, 538 U.S. at 23 (citations omitted).  The gross disproportionality principle applies "only in the 'exceedingly rare' and 'extreme' case."  Andrade, 538 U.S. at 73 (citations omitted).

Applying these standards, in Ewing, the Supreme Court rejected the defendant's claim that a sentence of 25 years to life for felony grand theft of three golf clubs was "grossly disproportionate" to his crime where the defendant had previously been convicted of three residential burglaries and a robbery.  Ewing, 538 U.S. at 18.  Similarly, in Andrade the Court reversed the Ninth Circuit's grant of habeas relief to a defendant sentenced to 50 years to life for a third strike involving petty theft of $150 worth of videotapes, concluding that the state court decision upholding the sentence was not "contrary to" the governing legal principles set forth in Supreme Court cases.  Andrade, 538 U.S. at 73-74.  The Court also held that the state appellate court did not "unreasonably appl[y]" the gross disproportionality principle to Andrade's case since that principle "gives legislatures broad discretion to fashion a sentence that fits within the scope of the proportionality principle  the 'precise contours' of which 'are unclear.'"  Id., 538 U.S. at 75-77.  According to the Supreme Court, "it was not objectively unreasonable for the California Court of Appeal to conclude that these 'contours' permitted an affirmance of Andrade's sentence."  Id.

1    In addition to <u>Andrade</u> and <u>Ewing</u>, the Supreme Court has also upheld a life sentence under

2  Texas's recidivist statute for obtaining \$120 by false pretenses, <u>Rummel v. Estelle</u>, 445 U.S. 263, 100

3  S. Ct. 1133 (1980), and a life sentence *without* the possibility of parole for possession of cocaine,

4  <u>Harmelin v. Michigan</u>, 501 U.S. 957, 111 S. Ct. 2680 (1991).

5    In light of this jurisprudence, the Court finds that Petitioner's sentence clearly is not "grossly

6  disproportionate" to the offense and therefore the Court must conclude that the sentence imposed in

7  this case and affirmed by the state courts did not offend the Eighth Amendment.   The crimes for

8  which Petitioner was convicted in this case, i.e., evading a peace officer and possession of heroin, are

9  unquestionably more serious than the petty theft in <u>Andrade</u>, for which a Three Strikes sentence was

10  found to be constitutionally permissible. The instant case is analogous to a drug possession case such

11  as <u>Harmelin</u>, wherein the Supreme Court upheld a life sentence *without the possibility of parole* for

12  possession of cocaine, despite the fact that the defendant was a first-time felony offender.  <u>Id.</u> at 1005.

13  Here, Petitioner was no first-time offender, nor does his sentence preclude parole. [7]

14    Beyond the instant offense, however,  the Court must consider Petitioner's prior history,

15  which is extensive.  As the Supreme Court stated in <u>Ewing</u>, "[i]n weighing the gravity of Ewing's

16  offense, we must place on the scales not only his current felony, but also his long history of felony

17  recidivism."  <u>Ewing</u>, 538 U.S. at 29.

18    Petitioner suffered four prior incarcerations in the California prison system prior to the instant

19  case.  (RT 428, 430; CT 216-217). Petitioner's "969b" packet indicates that he was convicted of first

20  degree burglaries in 1986 and 1987 (Cal. Pen. Code § 459), possession of marijuana in prison in 1989

21  (Cal. Pen. Code § 4573.6), evading a peace officer in 1992 (Cal. Veh. Code § 2800.2), and possession

22  of a controlled substance in 1993 (Cal. Health & Safety Code 11377) (CT 304-312).

23    Petitioner's prison chronology, also submitted as part of the "969b" packet, indicates that he

24  was first received as an adult in the California prison system on February 5, 1986, for a two-year

25

26    [7] California Penal Code § 3041 provides that parole must be granted unless certain criteria, not
present in this case, are met. § 3041 further provides that the California Board of Prison Terms must
27  grant parole unless it determines that public safety requires a lengthier period of incarceration for the
individual because of the gravity of the offense underlying the conviction. <u>In re Rosenkrantz</u>, 29 Cal.
28  4th 616, 654. 128 Cal. Rptr. 2d 104 (2002).

sentence arising from the initial first-degree burglary conviction used as a "strike" at his trial.
(CT 312, 328).  The California Department of Corrections paroled Petitioner on January 2, 1987, but
he was rearrested on February 3, 1987 and found to have violated his parole on March 3, 1987.
(CT 328).

On November 2, 1987, Petitioner was again incarcerated for a term of two years as a result of
the second first-degree burglary conviction used as a strike at trial.  (CT 217, 310, 328).  On May 18,
1989, while incarcerated for this conviction, Petitioner pleaded guilty to possession of marijuana in
prison (Cal. Pen. Code § 4573.6) and was sentenced to a 16 month prison term concurrent with his
burglary sentence.  (CT 308).

Petitioner was released on parole on March 28, 1991, but was re-arrested on August 19, 1991;
and his parole was revoked on September 12, 1991.  (CT 324).  After serving his parole revocation
term in prison, he was paroled again on August 9, 1992.  (CT 322).  However, three months later, his
parole was revoked for committing a new offense.  (CT 322).  On December 17, 1992, Petitioner was
convicted of evading a police officer (Cal. Veh. Code § 2800.2) and sentenced to a term of 16
months.  (CT 306; 322).

On August 27, 1993, Petitioner was once again paroled only to re-offend on October 2, 1993,
and have his parole revoked on November 4, 1993.  (CT 320, 354).  On April 25, 1994, Petitioner
pleaded guilty to one count of possession of methamphetamine (Cal. Health & Safety Code § 11377)
related to the October 2, 1993 incident.  (CT 304; 357).  The court sentenced Petitioner to a prison
term of 16 months, to be served concurrent with any parole revocation he might suffer.  (CT 304).

Petitioner was next paroled on August 16, 1994, only to be arrested a month later on
September 29, 1994.  (CT 320).  Petitioner was convicted on October 14, 1994, of misdemeanor
unlawful entry of property (Cal. Pen. Code § 602.5) and sentenced to two years' probation.  (CT 217).
His parole was revoked on October 14, 1994.  (CT 318).   The now-familiar pattern of criminality
continued when Petitioner was paroled on April 21, 1995, re-arrested eight days later, and his parole
again revoked.  (CT 318).  Released in July 1995, re-arrested and returned to prison on August 1,
1995, Petitioner was paroled for a final time on November 5, 1995.  (CT 316, 318).  Two months
later, on January 9, 1996, Petitioner was arrested for the offenses giving rise to his present convictions

1    and sentence of 28 years to life. (CT 316).

2         At sentencing, Petitioner's counsel stressed the non-violent nature of his convictions, the

3    possibility that Petitioner could be rehabilitated, and the harshness of a "three strikes" sentence in

4    light of his age and record. (RT 430-432). Petitioner's trial counsel made an eloquent plea on his

5    behalf, asking the court to be "compassionate" and noting that such a lengthy sentence "strain[ed] the

6    quality of mercy" in Petitioner's case. (RT 432).

7         In response, the trial court noted that, while technically considered "non-violent," residential

8    burglaries such as those which formed the predicate "strikes" for Petitioner's sentence, had the

9    potential for violence, "particularly when the perpetrator is discovered while still in the home or

10   entering or leaving the residence." (RT 436-437). The trial court also observed that the evading a

11   peace officer conviction was not a "wobbler" but a "non-reducible felony." (RT 434). The court

12   emphasized that Petitioner's reckless driving endangered not only his passengers and himself, but

13   other traffic on Highway 99 as he attempted to elude police. (RT 434). The court found that

14   Petitioner had been "busy criminally" since his first juvenile adjudication in "the early 80's."

15   (RT 436). After finding that the probation report was correct in determining that the aggravating

16   factors in the case outweighed the mitigating factors, the court denied Petitioner's request to dismiss

17   one of the strikes and sentenced him to 28 years to life. (RT 438).

18        Contrary to Petitioner's assertions, given his extensive prior record, his is not "the rare case in

19   which a threshold comparison of the crime committed and the sentence imposed leads to an inference

20   of gross proportionality." Harmelin, 501 U.S. at 1005. As was true in Ewing, Petitioner's sentence of

21   28 years to life is justified by the State's public-safety interest in incapacitating and deterring

22   recidivist felons, and is amply supported by Petitioner's numerous convictions documenting his

23   disregard for the law. Ewing, 538 U.S. at 29-30.

24        In sum, Petitioner's sentence, when compared with his underlying offenses, does not violate

25   the Eighth Amendment's prohibition on cruel and unusual punishment. Based on the foregoing, the

26   Court concludes that the state court's rejection of this claim was not contrary to, or an unreasonable

27   application of, clearly established federal law. Accordingly, Ground Five must be denied.

28   ///

## RECOMMENDATION

Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus (Doc. 1), be DENIED.

This Report and Recommendation is submitted to the United States District Court Judge assigned to the case pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy of this Report and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Report and Recommendation."  Replies to the Objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: August 29, 2005

Theresa A. Goldner
UNITED STATES MAGISTRATE JUDGE